**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**JAMES CARL MOORE,**

      **Plaintiff,**

**v.**                            **Case No.: 2:14-cv-09913**

**CAROLYN W. COLVIN,
Acting Commissioner of
Social Security,**

      **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

      This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable Thomas E. Johnston, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's brief requesting judgment on the pleadings and the Commissioner's brief in support of her decision requesting judgment in her favor. (ECF Nos. 9 & 10).

      The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for

1

judgment on the pleadings be **DENIED**, the Commissioner's request for judgment on the pleadings be **GRANTED**, the Commissioner's decision be **AFFIRMED,** and that this case be **DISMISSED** and removed from the docket of the Court.

## I. <u>Procedural History</u>

On April 6, 2011, Plaintiff James Carl Moore ("Claimant"), filed applications for DIB and SSI, alleging a disability onset date of June 2, 2009, (Tr. at 101, 545), due to "(1) back injury; L3 thru S1 are bulging; (2) nerve damage on right side of spine due to bulging discs; (3) headaches from back injury; (4) leg and ankle problems; both legs." (Tr. at 165). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 64, 73). Claimant then filed a request for an administrative hearing, (Tr. at 62), which was held on January 18, 2013, before the Honorable Sabrina Tilley, Administrative Law Judge ("ALJ"). (Tr. at 552-580). By written decision dated February 21, 2013, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 11-20). The ALJ's decision became the final decision of the Commissioner on December 16, 2013, when the Appeals Council denied Claimant's request for review. (Tr. 3-5).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner subsequently filed an Answer opposing Claimant's complaint, and a Transcript of the Administrative Proceedings. (ECF Nos. 5 & 6). Claimant filed a Brief in Support of Judgment on the Pleadings, (ECF No. 9), and the Commissioner then filed a Brief in Support of Defendant's Decision, (ECF No. 10), to which Claimant filed a reply. (ECF No. 11). Consequently, the matter is fully briefed and ready for resolution.

## II.     Claimant's Background

Claimant was 47 years old at the time that he filed the instant applications for benefits, and 49 years old on the date of the ALJ's decision. (Tr. at 19, 101, 545). He has a high school education and communicates in English. (Tr. at 19, 125, 164, 166). Claimant previously worked for a lumber company driving a truck, delivering lumber, and working in the company's warehouse. (Tr. at 143-44). He has also worked as a janitor. (Tr. at 143, 145, 166).

## III.     Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1

3

to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2014. (Tr. at 13, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since June 2, 2009, the alleged disability onset date. (Tr. at 13, Finding No. 2). At the second step of the evaluation, the ALJ found

4

that Claimant had the following severe impairment: "residuals of a back injury with mild spinal stenosis." (Tr. at 13-15, Finding No. 3). The ALJ also considered Claimant's other impairments, including headaches, neck pain/cervical sprain, and symptomatic tendinopathy of the left shoulder with degenerative changes. (Tr. at 15). However, she found that these impairments were non-severe because they would not cause a significant limitation in Claimant's ability to perform work, did not affect him for a period of twelve consecutive months, and "resolved promptly with either no treatment or after brief treatments including medication, hospitalizations, x-rays, and over-the-counter remedies." (*Id.*)

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 15, Finding No. 4). Accordingly, she determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can lift and carry 20 pounds occasionally and 10 pounds frequently, sit for six hours in an eight-hour day, and stand and walk six hours in an eight-hour day. He can never climb ladders, ropes, or scaffolds and occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. He can occasionally perform overhead reaching with the non-dominant left shoulder. He should avoid concentrated exposure to extreme cold, wetness, vibrations, and hazards.

(Tr. at 15-19, Finding No. 5). At the fourth step, the ALJ determined that Claimant was unable to perform any past relevant work. (Tr. at 19, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 19-20, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1963, and was defined as a younger individual age 18-49; (2) he had at least a

high school education and could communicate in English; and (3) transferability of job skills was not an issue because using the Medical-Vocational Rules as a framework supported a finding that the Claimant is "not disabled," whether or not the Claimant had transferable job skills. (Tr. at 19, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that exist in significant numbers in the national economy, (Tr. at 19-20, Finding No. 10), including work as a fast food worker, laundry worker, and kitchen worker at the light exertional level. (Tr. at 20). In addition, the ALJ found that Claimant could perform work as a surveillance system monitor, order clerk, and press operator at the sedentary exertional level. (*Id.*) Therefore, the ALJ concluded that Claimant was not disabled as defined in the Social Security Act, and thus was not entitled to benefits. (Tr. at 20, Finding No. 11).

## IV.   <u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the ALJ erred in two respects. First, Claimant argues that the ALJ incorrectly found that his headaches, neck pain, and tendinopathy of the left shoulder were non-severe impairments. (ECF No. 9 at 9). He insists that objective medical evidence proves that these impairments significantly limit his ability to engage in basic work activities, and therefore, they are severe impairments as defined by the regulations. (*Id.*) Claimant points out that he began complaining of neck pain as early as 2009 and he was treated for headaches as early as 2011. (*Id.* at 10-11). As such, he contends that his neck pain and headaches are "continuing and ongoing difficulties." (*Id.* at 11). Second, Claimant avers that the ALJ improperly discredited his testimony on the basis that he failed to obtain treatment for his symptoms on a consistent basis. (*Id.*) He argues that the ALJ's discussion of any gaps in Claimant's medical treatment when

6

assessing his credibility constituted reversible error under Social Security Ruling ("SSR") 96-7p, 1996 WL 374186. (ECF No. 9 at 12). Moreover, Claimant asserts that the ALJ overlooked medical records proving that Claimant received treatment during the periods of time that the ALJ found to contain gaps. (*Id.*)

In response, the Commissioner maintains that there is no record evidence that Claimant's headaches, neck pain, and left shoulder tendinopathy significantly limited his ability to perform basic work activities for at least twelve consecutive months as required by the regulations. (ECF No. 10 at 14). To the contrary, with regard to Claimant's headaches, the Commissioner points out that CT scans of Claimant's head were normal and unremarkable. (*Id.* at 14-15). Moreover, the Commissioner highlights Claimant's use of over-the-counter medication to control his headache symptoms. (*Id.* at 15). As for Claimant's alleged neck pain and left shoulder tendinopathy, the Commissioner asserts that Claimant's treatment records show that his complaints about these conditions were "sporadic and conflicting." (*Id.*) Furthermore, even assuming that the ALJ erred at step two, the Commissioner contends that the error was harmless because she determined that Claimant had a different severe impairment at step two, continued with the sequential process, and considered all of Claimant's alleged impairments at later steps, whether or not she found them to be severe. (*Id.* at 16-17).

In response to Claimant's second challenge, the Commissioner argues that the ALJ complied with SSR 96-7p because she considered Claimant's explanation for the purported gaps in treatment before using those gaps in arriving at her credibility determination. (ECF No. 10 at 18). Additionally, the Commissioner points out that the ALJ's credibility finding was also based on an analysis of Claimant's daily activities and Claimant's treatment records. (*Id.* at 19-20). As such, the Commissioner insists that the

ALJ's credibility finding was supported by substantial evidence. (*Id.*)

## V.   **Relevant Medical Evidence**

The ALJ found that Claimant had a severe impairment related to "a back injury with mild spinal stenosis." (Tr. at 13). The issues raised by Claimant's challenges to the Commissioner's decision relate to Claimant's allegations headaches, neck pain, and left shoulder tendinopathy. Accordingly, the undersigned has reviewed all of the evidence before the Court in reference to these allegations, including the records of Claimant's health care examinations, evaluations, and treatment. The relevant medical information is summarized as follows:

### *A. Treatment Records*

On April 15, 2009, Claimant presented to the Charleston Area Medical Center ("CAMC") emergency department with complaints of a red spot in the inner corner of his sclera that had increased in size. (Tr. at 247). He also complained of a headache located over his forehead and the bridge of his nose with several episodes of severe vomiting. (*Id.*) Claimant reported that, although the nausea had ceased, his headache had become more severe. (*Id.*) Claimant indicated a history of prior headaches; however, he related that his past headaches were not as severe. (*Id.*) He reported additional symptoms of blurry vision in his right eye, sore throat, and cough. (*Id.*) Upon physical examination, Jeffrey Mullen, D.O., found tenderness to palpation over Claimant's right frontal and maxillary sinus with flexion of the neck. (*Id.*) Dr. Mullen also observed that Claimant reported experiencing pain in his temple with flexion of his knees and pain in his neck. (*Id.*) A chest x-ray taken that day showed no acute cardiopulmonary process. (Tr. at 248, 252). A CT scan of Claimant's head without contrast was also performed, and it was found to be normal. (Tr. at 251). Claimant was

diagnosed with influenza and a subconjunctival hemorrhage. (Tr. at 248). He was prescribed Lortab and discharged in stable condition. (*Id.*)

Claimant returned to the emergency department at CAMC on June 2, 2009 with complaints of neck pain, low back pain, and a mild headache after being involved in a rear impact collision. (Tr. at 238). Claimant reported that his pain increased with movement and that the pain in his back traveled down his buttocks, but not down his legs. (*Id.*) He thought that he may have hit his head slightly during the accident, although he did not believe that he lost consciousness. (*Id.*) William Payne, M.D., examined Claimant and observed that he had slight paraspinal tenderness. (Tr. at 239). Dr. Payne recorded that Claimant was alert and oriented times three, and his cranial nerves II-XII, motor, and sensory were intact. (*Id.*) Examination of Claimant's head revealed slight occipital tenderness. (*Id.*) An x-ray of Claimant's chest revealed low volume inspiration; however, no other acute abnormalities and no significant interval changes from the April 2009 x-ray were observed. (Tr. at 239, 241). A CT scan of Claimant's cervical spine revealed no acute abnormalities, and a CT scan of his head displayed no acute intracranial abnormalities and no significant interval changes from CT scan performed in April 2009. (Tr. at 239, 242-43). Dr. Payne recorded that Claimant had a negative workup and that he experienced some relief with Toradol, but he obtained the most pain relief from Demerol and Phenergan. (Tr. at 239). Claimant was assessed with a lumbar strain, a cervical strain, and a contusion of the head. (Tr. at 240). He was instructed to not work for four days and follow up with another doctor, Dr. Ramesh. (*Id.*) Dr. Payne also recommended that Claimant apply heat to his neck and back. (*Id.*) Claimant was prescribed Vicodin-ES, Flexeril, and Naprosyn. (*Id.*)

On June 7, 2009, Claimant visited the CAMC emergency department and

reported that he would like to return to work. (Tr. at 236). He relayed that he was unable to follow up with Dr. Ramesh as the doctor was out of the country. (*Id.*) Claimant reported that he had no physical complaints at that time. (*Id.*) Paula Yanero's, PA-C, physical examination of Claimant's head revealed that it was normocephalic and atraumatic. (*Id.*) Claimant's back displayed no gross misalignment, ecchymosis, or abrasion. (*Id.*) Physician Assistant Yanero recorded that Claimant's back was nontender to palpation and his range of motion in his back was 90 degrees forward, 30 degrees backward, and 45 degrees on each side. (*Id.*) She diagnosed Claimant with a history of low back pain secondary to a motor vehicle collision, which had resolved. (Tr. at 237). Claimant was discharged with authorization to return to work. (*Id.*)

On June 15, 2009, Claimant presented to the CAMC emergency department and reported that upon returning to work, he experienced an acute exacerbation of his low back pain, which he described traveled up his back to the proximal thoracic spine. (Tr. at 234). He also stated that he was experiencing headaches from the pain. (*Id.*) He further reported that his pain worsened with movement. (*Id.*) Claimant denied any rigidity in his neck. (*Id.*) Upon physical examination, Edward Wright, M.D., found that Claimant's head was atraumatic and normocephalic. (Tr. at 235). Dr. Wright observed that Claimant's neck was supple with no palpable masses, lymphadenopathy, or tenderness. (*Id.*) Dr. Wright's examination of Claimant's thoracic spine revealed no significant neck tenderness to the midline. (*Id.*) Dr. Wright recorded that Claimant experienced pain in his right paraspinous muscles of the lumbar region and exhibited tenderness to palpation of his bilateral paraspinous muscles of the proximal thoracic spine. (*Id.*) Dr. Wright also noted that there was some minor tenderness to Claimant's trapezius bilaterally, which extended into the occipital region of his skull. (*Id.*) Claimant was

diagnosed with acute exacerbation of low back pain and muscle spasms of the paraspinous muscles of the thoracic spine. (*Id.*) He was given Toradol, Norflex, and Lortab at the hospital, and discharged in improved, stable condition. (*Id.*) Claimant was prescribed Naprosyn, Soma, and Lortab, and advised to remain active. (Tr. at 235, 470).

On June 26, 2009, Claimant received a referral to a physical therapist for evaluation and treatment of his neck, mid back, and low back pain/strain as well as his left shoulder pain/strain. (Tr. at 467). That same day, Claimant underwent an initial evaluation at CAMC's Sprains and Strains Clinic. (Tr. at 355). Claimant indicated that he did not suffer from chronic pain; however, he reported at that time experiencing neck and low back pain as a result of the recent motor vehicle accident. (Tr. at 355-56). Claimant expressed that he had an immediate onset of neck, mid back, and low back pain after the accident, and although he did not recall left shoulder pain upon impact, he did notice it approximately ten minutes after the accident occurred. (Tr. at 356). Examination of Claimant's head and neck revealed good range of motion, but he did experience some stiffness. (*Id.*) Examination of Claimant's left shoulder revealed pain in the supraspinatus area, but otherwise Claimant possessed good range of motion. (*Id.*) Claimant also had good strength in his upper extremities and lower extremities. (*Id.*) He was assessed with neck, mid back, and low back pain/strain, and a left shoulder injury with pain and strain. (*Id.*) MRIs of Claimant's lumbar, cervical, and thoracic spine were ordered to rule out radiculopathy, fractures, or other pathology. (*Id.*) In addition, an MRI of the left shoulder was ordered to rule out tears or fractures. (*Id.*) Claimant was advised to stretch, use ice, and take Tylenol or Motrin for pain. (*Id.*)

On June 30, 2009, Claimant underwent MRIs of his cervical, lumbar, and thoracic spine at CAMC. (Tr. at 230-32). The MRI of Claimant's cervical spine displayed

no signs of herniated disc material, spinal stenosis, or other definite abnormalities. (Tr. at 230). The MRI of Claimant's lumbar spine revealed mild spinal stenosis at L4-L5 with mild bulging of disc material; however, there were no signs of herniated disc material or other signs of spinal stenosis. (Tr. at 232). The MRI of Claimant's thoracic spine showed no signs of herniated disc material or spinal stenosis. (Tr. at 231). An MRI of Claimant's left shoulder was also performed that day, and it revealed tendinopathy involving the supraspinatus tendon and degenerative changes in the right acromioclavicular ("AC") joint; however, there was no evidence of a rotator cuff tear. (Tr. at 233).

On July 8, 2009, Claimant followed up at CAMC. (Tr. at 352). He denied any paresthesias or loss of control of his bowels and bladder. (*Id.*) He reported that he tried to return to work shortly before that appointment, but could not due to the pain that he was in. (*Id.*) Claimant was instructed to wear a back brace. (*Id.*) Claimant was observed to have better range of motion in his left shoulder, but he still reported pain in that shoulder. (Tr. at 351-52).

On July 22, 2009, Claimant again visited CAMC and reported that he felt "about the same." (Tr. at 351). That same day Claimant began physical therapy for neck, back, and left shoulder pain at CAMC Physical Therapy and Sports Medicine Center. (Tr. at 460). He continued physical therapy there from July 22, 2009 through August 5, 2009. (Tr. at 390-97). At his July 22, 2009 appointment, Claimant reported that his pain was a six out of ten, but that sometimes it increased to an eight out of ten. (*Id.*) He also stated that rest helped his pain, and that prolonged sitting or standing made it worse. (*Id.*) The physical therapist noted that Claimant's gait was slow and antalgic. (*Id.*) A straight leg raise test was positive on Claimant's right leg and negative on his left leg. (Tr. at 461). The physical therapist observed that Claimant experienced back pain at all levels with

12

physical activity, but the pain was most pronounced in his lower back. (*Id.*) Claimant was assessed with low back pain; general, non-specific neck and periscapular pain; and a left shoulder strain. (Tr. at 462). The physical therapist opined that Claimant's rehabilitation potential was "fair/good" and that Claimant should attend therapy two-to-three times per week for six-to-eight weeks. (*Id.*) On July 27, 2009, the physical therapist noted that Claimant's pain had improved in his left shoulder and neck. (Tr. at 392). The physical therapist also recorded that Claimant described his low back pain as a five out of ten at that time. (*Id.*) Claimant was observed to have an improved tolerance to exercise and an increased willingness to exercise. (*Id.*) He was also observed to have increased flexion and range of motion. (*Id.*) On July 30, 2009, the physical therapist recorded that Claimant's neck and shoulder were asymptomatic, and he rated his mid back and low back pain as a five out of ten. (*Id.*) Claimant's physical therapist again noticed that he had improved tolerance for exercise. (*Id.*) On August 3, 2009, Claimant reported that his low back pain had decreased, but his back still bothered him with prolonged standing or walking. (Tr. at 391). The physical therapist opined that Claimant was steadily improving, but may have some loss of lumbar extension. (*Id.*) At his next appointment two days later, Claimant reported that his back pain had increased since his last therapy session. (*Id.*) The physical therapist observed that Claimant did not experience any increased pain during exercises and that his symptoms were slightly decreased during the therapy session. (*Id.*) On August 7, 2009, Claimant's wife called the physical therapist and reported that Claimant was advised to discontinue physical therapy by his pain management physician. (Tr. at 388, 390).

On August 6, 2009, Claimant was referred by Dr. Harry Young to The Center for Pain Relief where he was evaluated by Richard Bowman, M.D. (Tr. at 211). Claimant

complained of neck and back pain that began above his beltline, primarily on his right side, and radiated to his mid back. (*Id.*) He also reported that he occasionally had pain in both shoulders. (*Id.*) Claimant described the pain as unbearable and rated it as a seven out of ten. (*Id.*) He stated that extended periods of sitting exacerbated the pain and that his pain was worst at night. (*Id.*) He further indicated that he received some relief from over-the-counter medications. (*Id.*) Claimant also reported experiencing headaches. (Tr. at 213). Upon physical examination, Dr. Bowman noted that Claimant's neck was soft and supple. (Tr. at 214). Dr. Bowman recorded that Claimant's worst pain was located in the low back and that it was exacerbated by extension. (Tr. at 215). He observed that Claimant reported no pain with upper extremity range of motion. (*Id.*) Dr. Bowman further observed that Claimant's left shoulder pain was improving well with physical therapy, but he indicated that Claimant had "failed" physical therapy. (*Id.*) He provided Claimant with a prescription for Lortab. (*Id.*)

Barry Stover, DPT, CSCS, of CAMC Physical Therapy and Sports Medicine Center submitted his discharge summary for Claimant to Dr. Young on August 31, 2009. (Tr. at 388). Mr. Stover wrote that Claimant had attended a total of five sessions of physical therapy. (*Id.*) He relayed that Claimant reported no improvement as well as continued difficulty with activities of daily living. (*Id.*) In addition, Claimant's wife had informed Mr. Stover that Claimant was to discontinue physical therapy at the request of his pain management physician. (*Id.*) In the discharge summary, Mr. Stover wrote that he was unable to take any "new formal objective measurements" before Claimant's discharge. (*Id.*) As such, Mr. Stover only relayed his initial objective findings to Dr. Young. (Tr. at 389). He indicated that Claimant's left shoulder flexion range of motion was 120 degrees with strength of 4+/5. (*Id.*) Claimant's left shoulder extension range of motion was 112

14

degrees with 4+/5 strength. (*Id.*) As for Claimant's low back, Mr. Stover observed that Claimant had moderate loss of both flexion and extension with increased pain when performing both. (*Id.*) He also noted that Claimant's sidebend to the left and right revealed only minimal loss. (*Id.*) In addition, Mr. Stover found that Claimant had initially experienced tenderness to palpation of his left lateral and posterior lateral shoulder with no exquisite tenderness. (*Id.*)

On November 3, 2009, Claimant visited the emergency room at CAMC for his back pain. (Tr. at 228). He reported persistent pain in his back caused by a motor vehicle accident. (*Id.*) He stated that his pain was worse with movement and mostly on the right side of his lower back; however, the pain did not radiate to his extremities. (*Id.*) Upon examination, Bryan Dent, PA-C, observed that Claimant had some mild lumbosacral tenderness with no swelling or spasm. (*Id.*) Physician Assistant Dent recorded that Claimant was not in acute distress at the time of the examination. (*Id.*) While Claimant requested a referral to a surgeon at that visit, Physician Assistant Dent opined that referral to a neurosurgeon was unwarranted given his findings and their incompatibility with Claimant's reported symptoms. (Tr. at 229). Claimant was provided prednisone and Lortab. (*Id.*) He was discharged with a diagnosis of mechanical lumbar pain and given prescriptions for Medrol Dosepak and Norco. (*Id.*)

On February 3, 2010, Claimant again treated with Dr. Bowman. (Tr. at 209). Dr. Bowman diagnosed Claimant with low back pain, lumbar radiculitis, and lumbar facet joint syndrome. (*Id.*) He performed a lumbar facet joint injection at Claimant's right L3-4, L4-5, and L5-S1. (*Id.*) Dr. Bowman also performed a radiofrequency ablation on Claimant's back that day at the right L3, L4, and L5 lumbar facet medial branch. (Tr. at 210). Claimant tolerated both procedures well. (Tr. at 209-10).

15

Claimant next visited Dr. Bowman on February 11, 2010. (Tr. at 208). Claimant reported that he had minimal pain since his last injection and that he was not experiencing any pain at the time of his appointment. (*Id.*) Dr. Bowman informed Claimant that the pain may "stay gone" or may recur, but another radiofrequency ablation could be performed if the pain came back. (*Id.*) Dr. Bowman's physical examination of Claimant's thoracic spine, lumbar spine, and lower extremities was unremarkable. (*Id.*) He opined that Claimant's low back pain and lumbar radiculitis associated with facet arthropathy had resolved with the injection treatment. (*Id.*)

Claimant again treated with Dr. Bowman on May 11, 2010. (Tr. at 202). Claimant reported that his back pain had returned, and he described the pain as constant and sharp. (*Id.*) He stated that the prior injection had only given him relief for about five weeks. (Tr. at 207). Dr. Bowman recorded that Claimant had been sent to a neurosurgeon by workers' compensation, but no surgery was to take place. (Tr. at 202).Claimant indicated that his pain level was an eight out of ten. (*Id.*) Upon physical examination, Dr. Bowman observed that Claimant had right lumbar pain exacerbated with extension, rotation, and axial loading of the facet joints. (Tr. at 207). Dr. Bowman also indicated that Claimant experienced mild pain with palpation of his L5-S1 paraspinal musculature and right upper buttock. (*Id.*) Straight leg raise tests were negative. (*Id.*) Dr. Bowman recommended that Claimant receive radiofrequency ablation treatment again, but prescribed Lortab for Claimant's pain until he could undergo the procedure. (Tr. at 207).

On July 1, 2010, Claimant returned to Dr. Bowman with a complaint of continued back pain. (Tr. at 200). Claimant indicated that his activity had been limited by his pain and that he was having trouble sleeping. (*Id.*) He reported that pain medication did help

some. (*Id.*) Claimant informed Dr. Bowman that workers' compensation had denied Claimant's request for approval of the radiofrequency ablation procedure. (Tr. at 205). Dr. Bowman opined that the procedure was the only option for Claimant's type of pain. (*Id.*) Dr. Bowman further recorded that Claimant's pain would not resolve without treatment given its chronicity. (*Id.*) Upon physical examination, Dr. Bowman observed that Claimant had significant axial back pain along L4 through S1, which was replicable with extension and rotation of the back. (*Id.*) He further recorded that Claimant experienced pain with palpation of the L5-S1 paraspinal musculature. (*Id.*) Dr. Bowman indicated that he would again ask workers' compensation to approve the radiofrequency ablation treatment. (*Id.*)

On August 11, 2010, Dr. Bowman sent a letter to James R. Fox, who was Claimant's attorney at the time. (Tr. at 448). Dr. Bowman stated that Claimant reported to him that he had experienced neck and back injuries as a result of a car accident. (*Id.*) Dr. Bowman also indicated that Claimant had reported left shoulder pain, but that his shoulder pain had improved with physical therapy. (*Id.*) As for Claimant's neck pain, Dr. Bowman asserted that it was unclear to him whether Claimant had suffered a cervical sprain or whether pain from Claimant's facets and discs was the source of his cervical injury. (Tr. at 449). Dr. Bowman explained that he did not have any treatment plan for Claimant's neck complaints because, as of his last appointment with Claimant, his neck was not symptomatic. (*Id.*) Dr. Bowman also recognized that Claimant had already undergone treatment for his shoulder and that it improved. (*Id.*) Accordingly, Dr. Bowman opined that Claimant would only need future treatment for his back pain. (*Id.*) Dr. Bowman expressed his belief that Claimant would do well with radiofrequency ablation treatment, which he would need to undergo once per year. (*Id.*) In discussing

17

the cost of Claimant's future treatments, Dr. Bowman stated that he did not anticipate Claimant would have any significant future costs related to his shoulder and neck. (Tr. at 450).

On February 3, 2011, Claimant visited the emergency department at CAMC for treatment of a headache. (Tr. at 225). He described the pain as a ten out of ten and stated that the pain started in his neck and radiated to the top of his head. (*Id.*) He reported feeling a stabbing, aching sensation on and off, which worsened several weeks before his visit. (*Id.*) Claimant indicated that his headache had caused him nausea. (*Id.*) He also stated that this headache was the same as his chronic headaches. (*Id.*) Lisa Queen, CFNP, and David Bailey, M.D., recorded that Claimant's only medications at that time included over-the-counter Tylenol and ibuprofen. (*Id.*) The treaters observed that Claimant's head was normocephalic and atraumatic. (*Id.*) His neck was supple, and he was somewhat sensitive to light, but otherwise his central nervous system was normal. (Tr. at 226). Claimant was diagnosed with a headache and chronic low back and neck pain. (*Id.*) He was provided Dilaudid and Norflex IM, which resolved his headache. (Tr. at 227). He was also encouraged to take Motrin 800 mg three times each day. (*Id.*) His treaters prescribed Lortab, and he was discharged. (*Id.*)

On August 25, 2011, Claimant presented to the CAMC emergency department with complaints of a "bad headache" for the previous two days with some nausea. (Tr. at 223). Claimant also described increased low back pain. (*Id.*) Upon physical examination, Claimant's neck was supple with no palpable mass and no tenderness. (*Id.*) His head was atraumatic and normocephalic. (*Id.*) Examination of Claimant's central nervous system revealed no abnormalities. (Tr. at 223-24). Andres Arboleda Palacio, M.D., opined that there was no indication for any diagnostics or medical imaging; instead,

Claimant was given normal saline solution, Toradol, Norflex, and Reglan. (Tr. at 224). Dr. Palacio observed that Claimant progressively improved with this treatment, and Claimant requested discharge two hours after being seen by Dr. Palacio, reporting that his headache was almost gone. (Tr. at 223-24). Claimant was given a prescription for Fioricet for his headache and discharged in improved, stable condition. (Tr. at 224).

Claimant returned to the CAMC emergency department on November 2, 2011, and reported that his back had "snapped." (Tr. at 219). He stated that his pain began that day when he arose from a swing on his front porch and heard a "pop" in his back. (*Id.*) Claimant indicated that he immediately fell and had to be carried to his couch where he stayed until EMS arrived. (*Id.*) Claimant described pain in his low back and numbness in his right leg down to his knee. (*Id.*) Claimant's family reported to Dr. Mullen that he had a prior history of chronic headaches. (*Id.*) Upon physical examination, Dr. Mullen recorded that Claimant's head was normocephalic and atraumatic, and his neck was supple and nontender. (*Id.*) Claimant exhibited some tenderness in the lower lumbar region, but was nontender in his midline and thoracic areas. (Tr. at 220). Dr. Mullen provided Claimant with Dilaudid, Norflex, and Toradol. (*Id.*) An x-ray of Claimant's pelvis was taken, which showed no evidence of fracture, dislocation, or radiopaque foreign body. (Tr. at 221). An x-ray of Claimant's lumbar spine was also taken, which revealed mild degenerative changes at the L1-L2 disc space level; however, there was no evidence of any acute bony injury to Claimant's lumbar spine. (Tr. at 222). Dr. Mullen diagnosed Claimant with low back/sacroiliac strain, and he prescribed Percocet and prednisone. (Tr. at 220). Dr. Mullen also recommended that Claimant follow up with a family doctor. (*Id.*)

On January 31, 2012, Claimant again visited the CAMC emergency department

with complaints of back and neck pain. (Tr. at 197). He stated that he had experienced chronic back and neck pain since being involved in a motor vehicle accident. (*Id.*) He reported that his back pain radiated down his right leg and his neck pain radiated down between his shoulder blades. (*Id.*) Claimant further indicated that the neck pain sometimes radiated across the top of the back of his head into the top of his scalp and that the pain was causing him a headache at that time. (*Id.*) He reported that his pain increased approximately every few months, but he had not visited a pain management clinic in one or two years. (*Id.*) Claimant denied experiencing visual disturbances and dizziness; however, he did report experiencing photophobia. (*Id.*) Examination of Claimant's head revealed no tenderness across his scalp or face. (Tr. at 197-198). Claimant's neck was supple with tenderness across the paracervical spinal muscles; however, no tenderness directly over the cervical spine and no nuchal rigidity were observed. (Tr. at 198). The treater recorded that range of motion in the neck was intact though slightly limited when looking side to side. (*Id.*) The treater further indicated that initially, Claimant's pain was very hypersensitive with any touching of the entire back; however, when he was distracted, he exhibited no tenderness directly over the spine. (*Id.*) Claimant did display some tenderness across his right lower lumbar paraspinal muscles. (*Id.*) The treater observed that Claimant had active range of motion intact to the upper and lower extremities. (*Id.*) He was ambulatory, and his gait was steady. (*Id.*) Claimant was provided morphine, Zofran, and Benadryl. (*Id.*) He reported that his symptoms significantly improved with these medications. (*Id.*) The treater assessed Claimant with cephalgia, which had improved, and acute chronic neck and low back pain. (*Id.*) Upon discharge, Claimant was given Flexeril, Lortab, and Motrin 800 mg. (*Id.*) He was instructed to rest and use warm, moist heat on his neck and back. (*Id.*) He

was again encouraged to follow up with a family doctor. (Tr. at 199).

Claimant returned to CAMC on August 21, 2012, and reported that he was experiencing a headache as well as back and neck pain. (Tr. at 217). He also stated that he was experiencing nausea and vomiting. (*Id.*) Claimant indicated that he was generally able to treat his symptoms at home by resting and taking Advil, but that occasionally this was not the case. (*Id.*) He also described chronic numbness in his right leg, but Donald Seidler, M.D., recorded that this symptom was at baseline. (*Id.*) Upon examination, Dr. Seidler noted that Claimant experienced some photophobia. (*Id.*) Dr. Seidler also observed that Claimant's neck was supple, and he had some tenderness in the lower lumbar area. (*Id.*) Dr. Seidler diagnosed Claimant with cephalgia and low back pain. (Tr. at 218). Claimant was given Morphine, Benadryl, and Zofran, which considerably relived his symptoms. (*Id.*) Upon discharge, Claimant was given Lortab, Norflex, and Phenergan. (*Id.*) Dr. Seidler instructed Claimant to follow up with another doctor or health clinic for ongoing care. (*Id.*)

### B. Evaluations and Opinions

On July 6, 2011, Claimant attended a disability determination evaluation with Nilima Bhirud, M.D. (Tr. at 443-447). Claimant reported a history of backache, headaches, and left ankle problems. (Tr. at 443). He informed Dr. Bhirud that his headaches began after he was involved in a June 2009 motor vehicle accident. (*Id.*) Dr. Bhirud observed that a CT scan of Claimant's brain performed after the accident was unremarkable. (*Id.*) Claimant indicated that he had not sought treatment for his headaches because he lacked medical insurance. (*Id.*) He also attributed his back pain to the motor vehicle accident. (*Id.*) Dr. Bhirud recorded that Claimant received workers' compensation after the accident. (*Id.*) She also noted that Claimant underwent an MRI

of his back after the accident, which revealed a bulging disc. (*Id.*) Dr. Bhirud further indicated that Claimant had seen two neurosurgeons and that neither recommended surgery. (*Id.*) Claimant also visited a pain clinic and received injections in his back, but he stated that these injections did not help his pain. (*Id.*) He informed Dr. Bhirud that prolonged standing and walking made his pain worse. (*Id.*) Claimant also complained of pain in both hands, both hips, his left shoulder, and his right ankle. (Tr. at 444). At the time of the examination, Claimant's only medication was Prilosec. (*Id.*)

Upon examination, Dr. Bhirud found that Claimant could pick up a pen from the floor, stand on each foot one at a time, perform heel and toe walking, and squat halfway. (*Id.*) Dr. Bhirud also observed that Claimant walked without ambulatory aids, his gait was limping to the right side, and he appeared comfortable in both sitting and standing positions. (*Id.*) Dr. Bhirud recorded that Claimant's neck was supple with no jugular venous distention, lymphadenopathy, or thyromegaly. (*Id.*) Claimant's cervical spine showed normal range of motion with no tenderness, and his thoracic spine was nontender as well. (Tr. at 445). Both scoliosis and kyphosis were absent. (*Id.*) Dr. Bhirud observed that Claimant's lumbar spine was moderately tender, and straight leg raise tests were positive on both legs at 70 degrees. (*Id.*) Dr. Bhirud's examination of Claimant's hand, hip, and shoulder joints was unremarkable. (*Id.*) Claimant's right ankle was not swollen, but he had some tenderness in that area and decreased range of motion. (*Id.*) Dr. Bhirud's assessed Claimant with a history of back pain, noting that he had moderate lumbar tenderness upon examination with forward flexion of 70 degrees, but possessed the ability to perform heel walking, toe walking, and squatting. (*Id.*) Dr. Bhirud's assessment did not contain any opinions as to Claimant's alleged neck pain, headaches, or left shoulder pain. (*Id.*)

On July 19, 2011, Caroline Williams, M.D., completed a Physical RFC Assessment regarding Claimant's functional limitations. (Tr. at 435-442). Dr. Williams recorded that Claimant's primary diagnosis was acute lumbar strain and his secondary diagnosis was "mild bulging L4-5; tendinopathy, suprasp[inatus.]" (Tr. at 435). Dr. Williams also noted that Claimant alleged degenerative changes as an impairment. (*Id.*) As to exertional limitations, Dr. Williams found that Claimant could occasionally lift or carry fifty pounds, frequently lift or carry twenty-five pounds, stand about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday. (Tr. at 436). Dr. Williams also indicated that Claimant had limited ability to push or pull with his upper extremities. (*Id.*) She determined that Claimant could perform repetitive push or pull actions using his left shoulder on an occasional basis given his past complaints of injury to that shoulder, his allegations of pain in that shoulder, and an MRI displaying degenerative changes in Claimant's AC joint in that shoulder. (Tr. at 437). She also noted that Claimant received physical therapy for his shoulder strain, which improved his symptoms. (Tr. at 436). As to Claimant's complaints of headaches, back pain, and neck pain, Dr. Williams stated that the record indicated his symptoms were sometimes relieved with ibuprofen, and there were no recent prescriptions for medications for these symptoms found in Claimant's file. (Tr. at 437). Additionally, Dr. Williams observed that there were no chiropractic, recent orthopedic, or additional radiology imaging records contained in Claimant's file. (*Id.*) Dr. Williams also noted that Claimant's low back symptoms improved with radiofrequency ablation. (Tr. at 436). As for postural limits, Dr. Williams determined that Claimant could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. (Tr. at 437). However, Dr. Williams opined that he could only occasionally climb ladders, ropes, and scaffolds. (*Id.*) Dr.

Williams further concluded that were no manipulative, visual, or communicative limitations established. (Tr. at 438-39). As for environment limitations, Dr. Williams found that Claimant could have unlimited exposure to extreme heat, wetness, humidity, noise, fumes, odors, dusts, gases, poor ventilation, and hazards, such as machinery or heights. (Tr. at 439). However, Dr. Williams indicated that Claimant should avoid concentrated exposure to extreme cold and vibration. (*Id.*) In addressing Claimant's alleged symptoms, Dr. Williams opined that Claimant's allegations were not totally credible as she found that his alleged symptoms were disproportionate to the medical evidence found in Claimant's file. (Tr. at 440). Dr. Williams also opined that the medical evidence did not support a finding that Claimant met or medically equaled any of the impairments contained in the Listing. (*Id.*) In the additional comments section of the Physical RFC Assessment form, Dr. Williams specifically noted that she had reviewed MRIs of Claimant's left shoulder and lumbar spine from June 2009, Claimant's reported activities of daily living, and Dr. Bhirud's findings from her July 2011 examination of Claimant. (Tr. at 442).

On September 14, 2011, Subhash Gajendragadkar, M.D., prepared a case analysis. (Tr. at 430). Dr. Gajendragadkar stated that he had reviewed of all medical records, Dr. Bhirud's findings, and Dr. Williams's Physical RFC Assessment. (*Id.*) Based upon his review of these documents, Dr. Gajendragadkar affirmed the Physical RFC Assessment completed by Dr. Williams. (*Id.*)

On February 15, 2012, Errol Sadlon, a Vocational Rehabilitation Consultant with Aylir Rehabilitation, Inc., performed a vocational rehabilitation evaluation at the request of James R. Fox, Claimant's counsel at that time. (Tr. at 184-194). Mr. Sadlon noted that the purpose of his evaluation was to assess the "vocational implications" of

24

the injuries that Claimant sustained in a June 2009 automobile accident. (Tr. at 184). Mr. Sadlon indicated that Claimant complained of severe headaches, which occurred twice each week and could last up to two days with migraine type features. (Tr. at 188). Claimant also reported neck pain that he described as "off and on." (*Id.*) In addition, Claimant stated that he experienced left shoulder pain and reduced range of motion in that shoulder. (*Id.*) He further claimed that he experienced occasional numbness in his left hand. (*Id.*) Mr. Sadlon observed that Claimant's greatest complaint concerned his low back, which constantly hurt and caused his right leg to go numb. (*Id.*) Claimant informed Mr. Sadlon that he could sit for less than one hour at a time, stand or walk for about twenty minutes at a time, climb and descend stairs with support, drive for approximately thirty minutes at a time, kneel, squat, and lift ten pounds on an occasional basis. (*Id.*) However, he stated that he had difficulty using his hands for fine manipulation, climbing ladders, bending his neck and back, rising from a kneeling or squatting position, reaching, and gripping. (*Id.*) Claimant also indicated that his right leg sometimes gave out and caused him to fall. (*Id.*) With regard to his daily activities, Claimant reported that he walked his dog three to four times each day for a period of fifteen to twenty minutes each time; watched television; performed inside household chores on occasion, including dusting, washing dishes, and "picking-up"; attended church; and occasionally went grocery shopping with his wife. (Tr. at 189). Claimant reported that his pain prevented him from mowing his lawn, hunting, fishing, attending sporting events, and visiting relatives. (*Id.*) Mr. Sadlon found that Claimant read at a fourth grade level, and Claimant informed Mr. Sadlon that he had learning difficulties. (Tr. at 190). In reviewing Claimant's past work, Mr. Sadlon opined that Claimant was incapable of returning to prior employment as a warehouse worker or truck driver

because those jobs were rated as heavy work and required physical capabilities outside of Claimant's range. (Tr. at 191-192). Mr. Sadlon also determined that Claimant had no readily transferable skills from his previous work as a custodian, warehouse worker, and truck driver. (Tr. at 190-91). He further found that Claimant did not have the ability to learn any new job skills, especially given his age. (Tr. at 191). Mr. Sadlon noted that there was no functional capacity evaluation available for his review, and therefore, he could not determine if the Claimant could consistently perform any other type of employment. (Tr. at 192). Mr. Sadlon concluded that the "residuals of the June 2009 motor vehicle accident" had a "significant impact" on Claimant. (*Id.*) He noted that Claimant's low back and left shoulder symptoms were considerably relieved by pain treatment; however, at the time of the evaluation, Claimant could no longer afford treatment, which prevented him from working. (*Id.*) Mr. Sadlon ultimately opined that Claimant was totally disabled due to the injuries he sustained from the June 2009 motor vehicle accident and his vocational factors. (*Id.*) Mr. Sadlon added that Claimant was unable to be employed because he could no longer obtain pain treatment. (Tr. at 194).

## VI.   <u>Standard of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir.

1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII. <u>Discussion</u>

### *A. Step 2 of the Disability Determination Process*

Claimant contends that the ALJ erred at step 2 of the process when she incorrectly determined that Claimant's headaches, neck pain, and left shoulder tendinopathy were non-severe impairments. (ECF No. 9 at 9). Claimant insists that these impairments significantly affect his ability to engage in work-related activities, and thus, they are severe impairments as defined by the regulations. (*Id.*) In support of his argument, Claimant points to the medical records, which substantiate that he first complained of neck pain in 2009 and continued to report neck pain until January 2012. (*Id.* at 10-11). In addition, Claimant asserts that he described experiencing headaches as early as February 2011 and continued to seek treatment for his headaches after that

date. (*Id.*)

At the second step of the sequential evaluation process, the ALJ determines whether the claimant has an impairment or combination of impairments that is severe. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). An impairment is considered "severe" if it significantly limits a claimant's ability to do work-related activities. 20 C.F.R. §§ 404.1521(a), 416.921(a); SSR 96-3p, 1996 WL 374181, at *1. "[A]n impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p, 1996 WL 374181, at *1 (citing SSR 85-28, 1985 WL 56856). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, remembering simple instructions, understanding simple instructions, carrying out simple instructions, using judgment, interacting appropriately with co-workers, and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b). The claimant bears the burden of proving that an impairment is severe, *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983), and does this by producing medical evidence establishing the condition and its effect on the claimant's ability to work. *Williamson v. Barnhart,* 350 F.3d 1097, 1100 (10th Cir. 2003). The mere presence of a condition or ailment is not enough to demonstrate the existence of a severe impairment. Moreover, to qualify as a severe impairment under step two, the impairment must have lasted, or be expected to last, for a continuous period of at least twelve months, 20 C.F.R. § 416.909, and must not be controlled by treatment, such as medication. *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). If the ALJ determines that the claimant does not have a severe impairment or combination of impairments, a finding of not disabled is made at step two, and the sequential process comes to an end.

On the other hand, if the claimant has at least one impairment that is deemed severe, the process moves on to the third step. "[T]he step-two inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir.1996) (citing *Bowen v. Yuckert,* 482 U.S. 137, 153-54, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987)); *see also Felton–Miller v. Astrue,* 459 F. App'x 226, 230 (4th Cir. 2011) ("Step two of the sequential evaluation is a threshold question with a de minimis severity requirement.").

Here, the ALJ found that Claimant had the severe impairment of "residuals of a back injury with mild spinal stenosis." (Tr. at 13). Accordingly, the sequential process proceeded to step three. From that perspective, as the Commissioner emphasizes, even if the ALJ erred by not considering Claimant's other impairments to be severe, Claimant suffered no harm because the outcome at step two was the same: Claimant's applications for benefits moved on to the next step in the sequence. Courts in this circuit have held that failing to list a severe impairment at the second step of the process generally is not reversible error as long as the process continues and any functional effects of the impairment are appropriately considered during the later steps. *See McKay v. Colvin,* No. 3:12–cv-1601, 2013 WL 3282928, at *9 (S.D.W.Va. Jun. 27, 2013); *Cowan v. Astrue,* No. 1:11-cv-7, 2012, WL 1032683, at *3 (W.D.N.C. Mar. 27, 2012) (collecting cases); *Conard v. Comm'r*, Case No. SAG-12-2290, 2013 WL 1664370, at *2 (D. Md. Apr. 16, 2013) (finding harmless error where Claimant made threshold of severe impairment regarding other disorders and "the ALJ continued with the sequential evaluation process and considered all of the impairments, both severe and non-severe, that significantly impacted [his] ability to work"); *Lewis v. Astrue*, 937 F. Supp. 2d 809, 819 (S.D.W.Va. 2013) (applying harmless error standard where ALJ proceeded to step

three and considered non-severe impairments in formulating claimant's RFC); *Cook ex rel A.C. v. Colvin*, Case No. 2:11-cv-362, 2013 WL 1288156, at *4 (E.D. Va. Mar. 1, 2013) ("The failure of an ALJ to find an impairment to be severe at Step 2, however, is harmless if the ALJ finds the claimant to suffer from another severe impairment, continues in the evaluation process, and considers the effects of the impairment at the other steps of the evaluation process."); *Mauzy v. Astrue,* No. 2:08–cv–75, 2010 WL 1369107, at *6 (N.D.W.Va. Mar. 30, 2010) ("This Court finds that it was not reversible error for the ALJ not to designate any of the plaintiff's other mental conditions as severe or not severe in light of the fact that he did, during later steps of the sequential evaluation process, consider the combined effect of all of the plaintiff's impairments."); A number of federal courts of appeals have agreed with this approach. *Jerome v. Colvin*, 542 F. App'x 566, 566 (9th Cir. 2013); *Gray v. Comm'r of Soc. Sec.*, 550 F. App'x 850, 853-54 (11th Cir. 2013); *Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013); *Henke v. Astrue*, 498 F. App'x 636, 640 (7th Cir. 2012); *Schettino v. Comm'r of Soc. Sec.*, 295 F. App'x 543, 545 n.4 (3d Cir. 2008); *Hill v. Astrue*, 289 F. App'x 289, 292 (10th Cir. 2008); *Maziarz v. Sec. of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).

Along with the absence of any prejudice to Claimant flowing from the ALJ's step two findings, Claimant's challenge is unpersuasive for other reasons. First, substantial evidence supports the ALJ's conclusion that some of Claimant's purportedly severe impairments were actually non-severe. The ALJ determined that Claimant's headaches, neck pain, and left shoulder tendinopathy were non-severe because these impairments had not affected him for twelve consecutive months and had resolved promptly with either no treatment or brief treatment. (Tr. at 15). Therefore, the ALJ concluded that

30

these impairments did not significantly limit his ability to perform basic work activities. (*Id.*)

Beginning with Claimant's headaches, the record demonstrates that Claimant reported experiencing or sought treatment for his headaches in April 2009, June 2009, August 2009, February 2011, August 2011, January 2012, and August 2012. (Tr. at 197, 213, 217, 223, 225, 234, 238, 247). On three of those occasions, Claimant's chief complaint was his headache, and his symptoms resolved with medication in a matter of hours. (Tr. at 217-18, 223-24, 225, 227). In addition, on two of those occasions, once before the accident and once after the accident, CT scans of Claimant's head were taken and found to be normal.[1] (Tr. at 243, 251). The ALJ specifically discussed these records in addressing Claimant's headaches and any impact they might have on Claimant's RFC. (Tr. at 17). Moreover, Claimant also indicated to a treater in August 2012 that he was generally able to reduce his headache symptoms at home by resting and taking Advil, although he occasionally needed to seek medical attention. (Tr. at 217). Claimant's statement seems to be supported by his testimony at the administrative hearing; there, he testified that he experienced headaches "a few times a week," which resolved in a couple of hours after taking Advil and lying down.[2] (Tr. at 567). Clearly, over-the-counter medication, for the most part, resolved Claimant's headaches, suggesting that his headache condition was not a severe impairment. Moreover, the treatment he received for his most severe headaches was infrequent, demonstrating that he did not

---

[1] In his letter to Mr. Fox, Dr. Bowman listed all of the injuries that Claimant suffered from the motor vehicle accident. (Tr. at 449). He did not include headaches on that list. (*Id.*)

[2] However, in Claimant's May 2011 Personal Pain Questionnaire, he stated that he experienced headaches three to four times each week lasting 12 to 24 hours. (Tr. at 152). He also stated that his headaches caused him to stay in bed "90% of the time." (Tr. at 153). In addition, he reported that ibuprofen sometimes relieved his pain. (*Id.*)

experience intense headaches very often. While Claimant testified that a lack of medical insurance prevented him from seeking treatment, (Tr. at 559), the records demonstrate that he visited the CAMC emergency department on a number of occasions for his other medical conditions presumably during the period that he lacked medical insurance. Furthermore, other than Claimant's testimony that he often rested to alleviate his headaches, no objective evidence in the record corroborated Claimant's contention that his typical headaches significantly limited his ability to perform basic work activities. Therefore, Claimant has failed to satisfy his burden. Accordingly, the ALJ's determination that Claimant's headache condition was a non-severe impairment is supported by substantial evidence.

Turning to Claimant's allegations of neck pain, the ALJ recognized that Claimant had been diagnosed with neck pain and a cervical strain, and she cited Claimant's medical records related to that diagnosis. (Tr. at 15). In his Disability Report, Claimant did not allege that neck symptoms limited his ability to work; however, he did report neck pain as a symptom in his Personal Pain Questionnaire and testified at the administrative hearing that he experienced neck pain. (Tr. at 151, 165, 557). In any event, the evidence shows that Claimant complained of neck pain in June 2009, July 2009, February 2011, January 2012, and August 2012. (Tr. at 197, 211, 217, 225, 238, 355). Claimant initially reported experiencing neck pain after the motor vehicle accident. (Tr. at 238). A CT scan of Claimant's cervical spine after the accident displayed no acute abnormalities, although he was assessed with a cervical strain. (Tr. at 240, 242). An MRI of Claimant's cervical spine performed weeks after the accident displayed no signs of herniated disc material, spinal stenosis, or other definite abnormalities. (Tr. at 230). The ALJ specifically cited these imaging studies when determining the severity

of his impairments. (Tr. at 14). Furthermore, Dr. Bhirud's examination of Claimant's cervical spine showed that Claimant had normal range of motion with no tenderness. (Tr. at 445). Additionally, both Dr. Bowman and Claimant's physical therapist recorded that Claimant's neck had improved and was asymptomatic in both 2009 and 2010. (Tr. at 392, 449). Dr. Bowman asserted that it was unclear to him whether Claimant had suffered a cervical sprain or whether pain from Claimant's facets and discs were the source of his cervical injury. (Tr. at 449). Nevertheless, Claimant's neck was asymptomatic at his last visit with Dr. Bowman, and as such, Dr. Bowman opined that he did not anticipate that Claimant would have any significant future medical costs related to his neck. (Tr. at 449-50). After Dr. Bowman wrote his opinion letter to Claimant's former attorney, the record evidence demonstrates that Claimant periodically reported experiencing neck pain to his treaters in February 2011, January 2012, and August 2012. However, Claimant's February 2011 neck pain essentially related to his headache condition, which is adequately controlled by over-the-counter medication. (Tr. at 225). Consequently, Claimant's only other recent complaints of neck pain occurred in January 2012 and August 2012, falling short of the twelve-month duration requirement. Furthermore, the objective medical evidence described above and relied on by the ALJ supports the ALJ's conclusion that Claimant's neck pain did not significantly limit his ability to perform basic work activities. Claimant plainly failed to meet his burden, and the ALJ's finding is supported by substantial evidence.

With regard to Claimant's left shoulder tendinopathy, again Claimant did not allege in his Disability Report that this impairment affected his ability to work. (Tr. at 165). Moreover, Claimant's left shoulder symptoms are also absent from his Personal Pain Questionnaire and his Adult Function Report. (Tr. at 151-63). Nonetheless, the ALJ

recognized at step two that Claimant had been diagnosed with symptomatic tendinopathy of the left shoulder with degenerative changes. (Tr. at 15). Claimant reported left shoulder symptoms to his treating or examining physicians and therapists in June 2009, July 2009, August 2009, and July 2011. (Tr. at 211, 356, 351-52, 393, 444). An MRI of Claimant's left shoulder taken in June 2009 revealed that he suffered from tendinopathy involving the supraspinatus tendon and degenerative changes in the right AC joint of the left shoulder. (Tr. at 233). Claimant's physical therapist recorded in July 2009 that Claimant's left shoulder had improved and that it was asymptomatic. (Tr. at 392). Dr. Bowman also observed that Claimant's left shoulder pain had improved with physical therapy. (Tr. at 215). In his letter to Mr. Fox, Dr. Bowman indicated the same and noted that Claimant's left shoulder had improved to the point that he did not expect Claimant would need future treatment for his shoulder. (Tr. at 449-50). The ALJ highlighted Claimant's left shoulder improvement in discussing Claimant's RFC. (Tr. at 17). She also specifically noted that Dr. Bhirud indicated that Claimant had normal range of motion in his left shoulder at the July 2011 examination. (*Id.*) Furthermore, the ALJ recognized that Claimant testified his left shoulder symptoms occurred only when the weather changed to damp conditions and that Claimant was right-hand dominant. (Tr. at 17, 566-67). Given Claimant's testimony and the opinions of Claimant's treaters as to his left shoulder condition, substantial evidence supported the ALJ's finding that Claimant's left shoulder tendinopathy is a non-severe impairment. While there is objective evidence of Claimant's left shoulder symptoms, as noted above, Claimant's treaters found that his symptoms resolved after attending physical therapy. Furthermore, Claimant's testimony at the administrative hearing demonstrates that his condition is not sufficiently continuous to meet the duration requirement. As such, the

34

ALJ appropriately found that Claimant's left shoulder condition did not affect his ability to perform basic work activities.

A second reason Claimant's challenge fails is that the ALJ considered all of Claimant's impairments when assessing his RFC, including limitations related to his headaches, neck pain, and left shoulder. While Claimant asserts in his reply brief that the ALJ failed to account for the impact of Claimant's headaches and neck pain after step two, this contention is belied by the ALJ's written decision. (ECF No. 11 at 1-2). Indeed, the ALJ expressly analyzed the evidence pertaining to Claimant's headaches, neck pain, and left shoulder tendinopathy during the written analysis of Claimant's RFC finding. (Tr. at 16-17). With regard to Claimant's headaches, the ALJ specifically noted that Claimant's symptoms were effectively controlled by medication, and thus, she concluded that Claimant's headaches did not support any additional limitations as to his RFC. (Tr. at 17). The ALJ also provided a detailed analysis of Claimant's left shoulder symptoms, and she *specifically included* a limitation with regard to Claimant's left shoulder in her RFC finding even though Claimant's left shoulder symptoms only occurred when the weather changed. (Tr. at 15, 17). In adding this limitation, the ALJ reviewed and assigned some weight to Dr. Williams's opinion that Claimant's use of his left shoulder for pushing and pulling was limited. (Tr. at 18). Finally, in relation to Claimant's neck pain, the ALJ reviewed the pertinent imaging studies and treatment records related to Claimant's neck pain at step two, and she recognized in determining Claimant's RFC that he complained of neck pain. (Tr. at 13-15, 16). The ALJ also considered Dr. Bhirud's examination report in determining Claimant's RFC, which contained Dr. Bhirud's findings as to the unremarkable nature of Claimant's cervical spine. (Tr. at 445). Though the ALJ did not explicitly summarize Claimant's treatment

records related to his neck pain in her RFC discussion, her written decision demonstrates that she at least considered the condition. Moreover, Claimant has not established how his neck pain, which from the record is clearly less functionally limiting than his low back pain, should alter the ALJ's RFC finding in any way. It seems that Claimant's RFC would remain the same even fully crediting Claimant's complaints of neck pain. Because the ALJ appropriately considered the functional effects of Claimant's headache, neck pain, and left shoulder conditions throughout the sequential process, any error by the ALJ in declining to find that these conditions were severe impairments was harmless. *See, e.g.*, *McKay*, 2013 WL 3282928, at *9.

Finally, as alluded to above, Claimant's challenge must also be rejected because its premise is fundamentally flawed. Claimant presumes that if the ALJ found Claimant's various impairments to be severe impairments at step two of the process, she automatically was bound to include functional limitations in the RFC finding to account for those impairments. "To the extent [Claimant] suggests that a finding of severe impairment at Step 2 necessarily requires limitations on a claimant's ability to perform basic work activities, this argument has no merit." *Burkstrand v. Astrue,* 346 F. App'x 177, 180 (9th Cir. 2009); *see also Perez v. Colvin*, No. 3:13CV868, 2014 WL 4852836, at *19 (D. Conn. Apr. 17, 2014) (report and recommendation noting that "ALJ is not required to assess additional limitations for each impairment"), report and recommendation adopted by 2014 WL 4852848 (D. Conn. Sept. 29, 2014); *Walker v. Colvin,* No. C13–3021–MWB, 2014 WL 1348016, at *7 (N.D. Iowa Apr. 3, 2014) ("A finding of a severe impairment at Step Two does not require the ALJ to provide related functional limitations at Step Four."); *Burns v. Astrue*, No. 2:11-cv-151-GZS, 2012 WL 313705, at *4 (D. Me. Jan. 30, 2012) (report and recommendation recognizing that "a

finding of a severe impairment need not always result in limitations in an RFC");
*Hughes v. Astrue,* No. 1:09CV459, 2011 WL 4459097, at *10 (W.D.N.C. Sept. 26, 2011)
(holding that a finding of impairment at step two is not "proof that the same limitations
have the greater significant and specific nature required to gain their inclusion in an
RFC assessment at step four"). As was demonstrated by the ALJ's assessment, whatever
symptoms Claimant displayed with regard to his headaches, neck pain, and left
shoulder, the record did not support a determination that they caused more than a
minimal impact on Claimant's ability to do work-related activities. For that reason, no
additional specific occupational restrictions were necessary with regard to these
conditions other than the limitations reflected in the ALJ's RFC finding.

Therefore, the undersigned **FINDS** that the ALJ did not err at step two of the
sequential process when she declined to find that Claimant's headaches, neck pain, and
left shoulder tendinopathy were severe impairments. In addition, the undersigned
**FINDS** that the ALJ properly considered Claimant's alleged conditions when
determining his RFC, and substantial evidence supported the ALJ's determination that
additional limitations related to Claimant's headaches, neck pain, and left shoulder
tendinopathy were not established.

### B. Claimant's Credibility

Next, Claimant argues that the ALJ erred in discrediting his allegations of his
symptoms because he failed to consistently obtain treatment. (ECF No. 9 at 11).
Claimant asserts that the ALJ incorrectly considered purported gaps in Claimant's
treatment without first taking into account Claimant's inability to afford treatment, as
required by SSR 96-7p. (*Id.* at 11-12). Furthermore, Claimant avers that the ALJ's
statement regarding gaps in the treatment records is factually unsupportable as the

record proves that Claimant sought and received treatment during the purported gaps. (*Id.* at 12).

Pursuant to the regulations, the ALJ evaluates a claimant's report of symptoms using a two-step method. 20 C.F.R. §§ 404.1529, 416.929. First, the ALJ must determine whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. *Id.* §§ 404.1529(a), 416.929(a). In other words, a claimant's "statements about his or her symptoms is not enough in itself to establish the existence of a physical or mental impairment or that the individual is disabled." SSR 96-7p, 1996 WL 374186, at *2. Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must assess the credibility of any statements made by the claimant to support the alleged disabling effects. SSR 96-7P, 1996 WL 374186, at *2. In evaluating a claimant's credibility regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources,

20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, *id.* §§ 404.1529(c)(2), 416.929(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3); *see also Craig*, 76 F.3d at 595; SSA 96-7P, 1996 WL 374186, at *4-5. In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges he suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 96-7P, 1996 WL 374186, at *6.

SSR 96-7p provides further guidance on how to evaluate a claimant's credibility. For example, "[o]ne strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record." *Id.* at *5. Likewise, a longitudinal medical record "can be extremely valuable in the adjudicator's evaluation of an individual's statements about pain or other symptoms," as "[v]ery often, this information will have been obtained by the medical source from the

individual and may be compared with the individual's other statements in the case record." *Id.* at *6-7. A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms also "lends support to an individual's allegations ... for the purposes of judging the credibility of the individual's statements." *Id.* at *7. On the other hand, "the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints." *Id.* Ultimately, the ALJ "must consider the entire case record and give specific reasons for the weight given to the individual's statements." *Id.* at *4. Moreover, the reasons given for the ALJ's credibility assessment "must be grounded in the evidence and articulated in the determination or decision." *Id.*

When considering whether an ALJ's credibility determinations are supported by substantial evidence, the Court does not replace its own credibility assessments for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to credibility, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, the ALJ scrutinized Claimant's allegations of his symptoms using the two-step process required by the regulations. First, the ALJ determined that Claimant's medically determinable impairments could reasonably be expected to cause his alleged symptoms. (Tr. at 16). Second, the ALJ concluded that Claimant's statements regarding

40

the intensity, persistence, and limiting effects of his symptoms were not entirely credible. (*Id.*) In assessing Claimant's credibility, the ALJ noted that Claimant alleged he had pain in his lower back, left shoulder, neck, right leg, and right hand. (*Id.*) The ALJ indicated that Claimant testified his back "popped" at least two times each month, which caused him to be unable to move for at least three days. (*Id.*) The ALJ also noted that Claimant stated his pain was a seven or eight out of ten and that medication reduced his pain, but did not totally relieve it. (*Id.*) She further recognized that Claimant testified he could sit for fifteen to twenty minutes, stand for thirty minutes, and walk for thirty minutes before experiencing back pain. (*Id.*) With regard to daily activities, the ALJ noted that Claimant testified at the administrative hearing that he walked his dog, cared for his personal hygiene, traveled to the grocery store with his wife, and performed a minimal amount of household chores. (*Id.*) The ALJ also described Claimant's daily activities as supplied in Claimant's Function Report, which included taking care of his personal hygiene, sitting on the porch two to three hours each day, driving a car, going to the grocery store with his wife, paying bills, managing finances, talking to friends and neighbors two to three times each week, watching television, and fishing, hunting, and camping on rare occasions. (Tr. at 17). In addition, the ALJ noted the daily activities that Claimant reported to Mr. Sadlon in February 2012, which included watching television, walking the dog three to four times each day for fifteen to twenty minutes at a time, dusting, washing dishes, picking up around the house, attending church, and grocery shopping with his wife. (*Id.*) The ALJ found that Claimant's daily activities were not limited to the extent that one would expect given Claimant's allegations of his disabling symptoms and limitations. (*Id.*); *see Hamilton v. Shalala*, 43 F.3d 1466, 1994 WL 645565, at *3 (4th Cir. Nov. 17, 1994) (unpublished table decision) (recognizing that

41

activities of daily living may undermine claims of impairment); *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (same).

Continuing her credibility analysis, the ALJ summarized Claimant's medical records with regard to his headaches and his left shoulder tendinopathy, and she compared the record evidence with Claimant's allegations. (Tr. at 16-17). She noted that Claimant was unable to receive treatment for his headaches because he lacked medical insurance, but that he sometimes sought treatment at the emergency department. (Tr. at 17). The ALJ also observed that a CT scan of Claimant's head in June 2009 revealed no acute intracranial abnormalities and that he treated his headaches with Advil and rest. (*Id.*) She further found that the medical records demonstrated that Claimant's headaches were effectively controlled by medication. (*Id.*) With regard to Claimant's left shoulder, the ALJ indicated that a medical record revealed that Claimant's left shoulder pain was improved with physical therapy and that Dr. Bhirud's examination of Claimant found that Claimant had full range of motion in that shoulder. (*Id.*)

The ALJ then remarked that Claimant had canceled or failed to appear at doctor appointments on a number of occasions. (*Id.*) She went on to state:

> The record reflects significant gaps in the claimant's history of treatment. The undersigned notes significant gaps in treatment in June 2009, then in February 2011. The record indicates visits to the emergency room in August 2011 and November 2011, with another gap, and an emergency room visit in August 2012.

(Tr. at 17-18).

After highlighting these purported treatment gaps, the ALJ observed that a discrepancy existed between Claimant's allegations of medication side effects at the administrative hearing and what he asserted in his Function Report and two disability reports. (Tr. at 18). She then compared Claimant's description of his low back symptoms

42

with the findings of Dr. Bhirud's examination. (*Id.*) Specifically, the ALJ observed that Claimant reported to Dr. Bhirud that he experienced constant, dull back pain that radiated into his right leg. (*Id.*) While Claimant had moderate tenderness in his lumbar spine and positive straight leg raise tests, which tended to support his claims, Dr. Bhirud recorded that Claimant was able to pick up a pen from the floor without difficulty, stand on each foot one at a time, walk on his heels, walk on his toes, and squat halfway. (*Id.*) Dr. Bhirud also indicated that Claimant had 5/5 muscle strength in both lower extremities. (*Id.*) Given Dr. Bhirud's observations, the ALJ concluded that Claimant's complaints were in excess of the physical medical findings. (*Id.*)

Not only did the ALJ consider records from Claimant's examining physicians in evaluating his credibility, but she also reviewed and analyzed the opinions of Dr. Williams, Dr. Gajendragadkar, and Mr. Sadlon in assessing Claimant's credibility. (Tr. at 18-19). The ALJ determined that portions of Dr. Williams's and Dr. Gajendragadkar's opinions were entitled to some weight, including the postural and environmental limitations found to exist by those doctors. (Tr. at 18). However, the ALJ pointed out that Claimant received additional treatment after Dr. Williams and Dr. Gajendragadkar formed their opinions, which tended to indicate that Claimant was more limited than the two medical consultants had found. (*Id.*) Furthermore, the ALJ assigned little weight to Mr. Sadlon's opinion that Claimant was totally disabled because he was not an acceptable medical source, his opinion was on an issue reserved to the Commissioner, and his opinion lacked the necessary rationale. (*Id.*) Moreover, the ALJ found that Mr. Sadlon's opinion was inconsistent with other record evidence. (Tr. at 18-19).

Claimant raises a narrow challenge to the ALJ's credibility determination. He maintains that the ALJ incorrectly determined that gaps existed in Claimant's treatment

records. (ECF No. 9 at 12). Moreover, Claimant argues that the ALJ failed to consider Claimant's explanation for the alleged gaps in treatment as required by SSR 96-7p, and this failure constituted reversible error. (*Id.* at 11-12).

Having thoroughly reviewed the medical records, the undersigned agrees with Claimant that the ALJ was mistaken when she found that "significant gaps in treatment" existed in 2009 and between 2011 and 2012.  Indeed, it is something of a mystery as to how the ALJ arrived at this conclusion.[3] Other than missing a couple of physical therapy sessions, (Tr. at 455), Claimant was fairly consistent in seeking treatment. For example, he visited CAMC at least five times in June 2009. (Tr. at 230, 234, 236, 238, 355). He also attended physical therapy and treated with Dr. Bowman or with other physicians at CAMC on a number of occasions from June 2009 to July 2010. (Tr. at 200, 202, 205, 207-11, 228, 390-92). With regard to the purported treatment gap between November 2011 and August 2012, Claimant visited the emergency department at CAMC in January 2012. (Tr. at 197). Unfortunately, the Commissioner sheds no light on this issue, neither conceding, nor explaining the ALJ's mistake.

Nonetheless, the undersigned disagrees with Claimant that this erroneous statement requires the Commissioner's decision to be remanded. "Procedural perfection in administrative proceedings is not required. This court will not vacate a judgment unless the substantial rights of a party have been affected." *Mays v. Bowen,* 837 F.2d 1362, 1364 (5th Cir. 1988). "No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Fisher v. Bowen,* 869 F.2d

---

[3] There is a gap in Claimant's treatment records between February 2011 and August 2011. (Tr. at 223, 225). However, it is unclear from the ALJ's written decision if this is what she was referencing.

1055, 1057 (7th Cir. 1989). When an ALJ's error "clearly had no bearing on the procedure used or the substance of the decision reached," the error is harmless and reversal is not required. *Morgan v. Barnhart,* 142 F. App'x 716, 723 (4th Cir. 2005) (unpublished) (quoting *Ngarurih v. Ashcroft,* 371 F.3d 182, 190 n. 8 (4th Cir.2004)).

Claimant contends that the ALJ's inaccurate impression that there were gaps in treatment was harmful because "the discussion of [Claimant's] treatment dates does not even adequately or fairly document the frequency with which [Claimant] received care." (ECF No. 9 at 12.) However, strangely enough, while the ALJ mentioned supposed gaps in care, contrary to Claimant's contention, the ALJ ***did not*** ignore, overlook, skip, or otherwise fail to discuss the medical records for the periods of time that she believed contained gaps. As a matter of fact, the ALJ twice discussed Claimant's medical record from his January 2012 visit to CAMC. (Tr. at 14, 17). Throughout her decision, the ALJ also cited Claimant's medical records from June 2009, May 2010, August 2010, and February 2011, in addition to other medical records that did not relate to the purported gap periods. (Tr. at 14, 15, 17). Moreover, she recognized that Claimant attended physical therapy, which occurred during a purported gap period. (Tr. at 17). Furthermore, the ALJ relied on Dr. Williams's RFC Assessment, which specifically recognized that Claimant treated with Dr. Bowman in July 2010, and she also discussed Dr. Bhirud's examination of Claimant, wherein Dr. Bhirud stated that she reviewed treatment records provided to her by Dr. Bowman's office.[4] (Tr. at 436-37, 445). Accordingly, the ALJ considered all of the medical evidence in the record.

When considering the ALJ's thorough review of the treatment records in conjunction with the remainder of her credibility analysis and the other evidence that

---

[4] Claimant treated with Dr. Bowman from August 2009 to July 2010. (Tr. at 205, 211).

the ALJ relied on in making her credibility determination, the undersigned finds that any error committed by the ALJ was harmless. *See Jones v. Astrue*, 623 F.3d 1155, 1161-62 (7th Cir. 2010) (holding that ALJ's mistaken belief regarding gap in treatment records did not require reversal where other reasons for discrediting claimant's allegations were cited by ALJ); *Cantrell v. Astrue*, No. 1:12-cv-00464, 2014 WL 4244235, at *5-*7 (D. Idaho Aug. 26, 2014) (holding ALJ's unsupported finding that gaps in treatment record existed constituted harmless error where other evidence supported ALJ's credibility determination). In assessing Claimant's credibility, the ALJ otherwise precisely followed the regulations governing credibility assessments when she considered the objective medical evidence, Claimant's treatment records, his alleged symptoms, and his statements regarding his abilities and activities. (Tr. at 16-18). Moreover, in accordance with SSR 96-7p, the ALJ analyzed the consistency of Claimant's allegations when compared with his past statements to medical providers and his past statements in various disability forms. (*Id.*) Ultimately, in addressing Claimant's credibility, the ALJ cited specific record evidence and articulated the reasoning for her finding that Claimant was not entirely credible.

Claimant bears the burden of demonstrating prejudice from the ALJ's error, and in the absence of prejudice, the error is harmless. *Shinseki v. Sanders,* 556 U.S. 396, 409, 129 S.Ct. 1696, 173 L.Ed.2d 532 (2009) ("the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."); *Camp v. Massanari,* 22 F.App'x 311, 2001 WL 1658913, at *1 (4th Cir. 2001);. Because the ALJ considered all of the record evidence and the ALJ's credibility determination is supported by substantial evidence, even excluding the ALJ's reliance on the purported gaps in treatment, Claimant can show no prejudice. *See Jones*, 623 F.3d at 1161-62;

46

*Cantrell*, 2014 WL 4244235, at \*5-\*7. Thus, her challenge on this ground must fail.

Turning to Claimant's second argument, as the Commissioner points out, the ALJ specifically noted that Claimant explained he could not regularly receive treatment due to a lack of medical insurance. (Tr. at 17). Gaps in seeking treatment may be used in assessing a claimant's credibility, and SSR 96-7p only requires that an ALJ *consider* any explanation that the claimant may provide before drawing any inference about the claimant's credibility from gaps in the treatment records. SSR 96-7p, 1996 WL 374186, at \*7; *see also Cardoza v. Astrue*, No. 3:10CV1951, 2012 WL 3727160, at \*7 (D. Conn. Apr. 13, 2012) (noting that ALJ may consider gaps in treatment and citing cases supporting that proposition). The ALJ considered Claimant's explanation, but also noted that Claimant occasionally sought treatment at the emergency room for his various conditions. (Tr. at 17); *see Connolly v. United States Soc. Sec. Admin., Comm'r*, No. 08-cv-509, 2010 WL 148137, at \*1, \*9 (D.N.H. Jan. 14, 2010) (adopting report and recommendation recognizing that ALJ is free to analyze assertion by claimant that he cannot afford treatment). Even assuming, *arguendo*, that the ALJ's brief notation in regard to Claimant's lack of medical insurance did not comply with the requirements of SSR 96-7p, again the undersigned finds that any error was harmless given the other reasons that the ALJ supplied for finding that Claimant was not entirely credible. *Jones*, 623 F.3d at 1161-62; *see also Brown v. Comm'r of Soc. Sec.*, 425 F. App'x 813, 817 (11th Cir. 2011) ("Because the gap in medical treatment did not play a major role in the ALJ's decision, any error in considering that gap in treatment was harmless."); *Geyer v. Comm'r of Soc. Sec.*, No. 3:13-cv-198, 2014 WL 7176473, at \*5 (S.D. Ohio Sept. 19, 2014) (holding that ALJ's failure to consider explanation regarding gap in treatment records was harmless given other substantial evidence supporting ALJ's credibility finding);

47

*Roth v. Colvin*, No. C12-2189, 2013 WL 3852884, at *5 (W.D. Wash. July 24, 2013) (finding that ALJ's failure to consider explanation for gap in treatment records was harmless error).

Accordingly, the undersigned **FINDS** that the ALJ's credibility determination is supported by substantial evidence. In addition, the undersigned **FINDS** that any error by the ALJ with regard to her consideration of any purported gaps in Claimant's treatment was harmless.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 9), **GRANT** the Commissioner's request for judgment on the pleadings, (ECF No. 10), **AFFIRM** the decision of the Commissioner, **DISMISS** this action, with prejudice, and remove it from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall

constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Thomas v. Arn*, 474 U.S. 140 (1985); *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Johnston, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**: February 4, 2015

Cheryl A. Eifert
United States Magistrate Judge